UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARCIA K. CLINGERMAN,          ) | |
| ) | |
| Plaintiff,          ) | |
| ) | |
| vs.          ) | Cause No. 1:12-cv-40-WTL-DKL |
| ) | |
| MICHAEL J. ASTRUE,          ) | |
| Commissioner of Social Security,          ) | |
| ) | |
| Defendant.          ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Marcia K. Clingerman requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"). The Court rules as follows.

### I.     PROCEDURAL HISTORY

Clingerman filed her application for DIB on June 21, 2007, alleging disability since June 6, 2005, in the form of scoliosis and arthritis of the lumbar spine, chronic obstructive pulmonary disease, nicotine dependence, psoriasis, and knee and hip problems. Her application was denied initially and on reconsideration, whereupon she requested and was granted a hearing before an Administrative Law Judge ("ALJ"). Clingerman was represented by a non-attorney representative at the May 3, 2010, hearing before ALJ Angela Miranda. At the hearing, Clingerman amended her onset date to June 18, 2007. Clingerman and a vocational expert also testified at the hearing. Thereafter, on September 3, 2010, the ALJ issued her decision that Clingerman was not disabled as defined by the Act. On November 10, 2011, the Appeals

Council denied Clingerman's request for review, and Clingerman thereafter filed this timely action for judicial review.

## II.     EVIDENCE OF RECORD

The relevant medical evidence of record follows.

### A.     Dr. Charles Purdy

Dr. Charles Purdy has been treating Clingerman since at least April 2006. On June 20, 2007, Clingerman reported to Dr. Purdy that she felt that her back pain, hip pain, and chronic obstructive pulmonary disease ("COPD") created a basis for disability, although Dr. Purdy only saw her for an adjustment of her blood pressure medications at that visit.

On June 26, 2007, Clingerman complained of wheezing and congestion. An examination revealed coughing and scattered wheezing. Dr. Purdy diagnosed acute bronchitis with some reactive airway disease. A chest x-ray performed on July 2, 2007, revealed a density over the right upper lobe. A CT scan of the chest dated July 23, 2007, showed evidence of COPD with persistent pleural parenchymal scarring of the left apex, persistent large cavitary mass in the right upper lobe extending from the hilum to the apex, multiple smaller satellite nodular densities, and multiple shotty mediastinal lymph nodes.

On August 17, 2007, Clingerman had x-rays of the left hip that showed marked joint space narrowing with near complete loss of the joint space over the cephalad and axial portions of the joint space, sclerotic changes over the articular surfaces with some cystic and spur-like changes consistent with extensive osteoarthritis. X-rays of the lumbar spine showed "marked" rotary levoscoliosis, reversal of the normal lordotic curve, multilevel degenerative disc changes with disc space narrowing with large right lateral bone spurs at L1-2, L2-3, L3-4, and L4-5, and smaller spurs on the left at L3-4 and L4-5. On September 17, 2007, x-rays of the knees showed

minimal chondrocalcinosis on the right and chondrocalcinosis on the left. X-rays of the left hip showed moderately severe osteoarthritis with prominent loss of joint space with osteophyte formation.

On November 1, 2007, Clingerman was seen for follow-up of her high blood pressure and back pain. She reported leg cramp side effects from her blood pressure medications. Dr. Purdy noted muscle tenderness in the lower back. He diagnosed poorly controlled hypertension and back pain.

An MRI of the lumbar spine dated November 5, 2007, showed acute marked levoscoliosis of the lumber spine with mild lateral wedging of the L3 vertebral body, and advanced degenerative disc changes throughout the lumbar spine. The x-ray revealed foraminal stenosis changes at almost every level, most severely at L4-5, and abnormal signal in the L1 through S1 vertebral bodies secondary to stress response or degenerative end-plate changes.

At an examination with Dr. Purdy on December 18, 2008, Clingerman complained of left hip pain, left leg pain, and bronchitis symptoms. There was pain with range of motion in the left hip. Dr. Purdy diagnosed left hip pain with arthritis, COPD, hypertension, hyperlipidemia, and acute bronchitis.

At a follow-up on October 22, 2009, Clingerman complained of chronic lumbar back and hip pain. She reported seeing a chiropractor and an orthopedist at the time. Dr. Purdy recommended pain management. In a letter to counsel dated October 22, 2009, Dr. Purdy noted that Clingerman suffered from low back pain and hip pain with arthritis in the lumbar spine and left hip, as well as COPD. Dr. Purdy opined that Clingerman was unable to work due to chronic pain in her lower back and left hip that Clingerman felt was aggravated with any exertion.

X-rays of Clingerman's hands dated May 10, 2010, revealed prominent arthritic changes with radial subluxation with possible limited erosion of the fourth and fifth proximal phalanges, mild first metacarpal-phalangeal joint space narrowing, and possible erosion of the ulnar base of the 4 proximal phalanx.

### B.  Dr. David Graybill

Dr. David Graybill began treating Clingerman on January 12, 2009. Clingerman reported progressive pain and stiffness of the left hip that went to the knee and occasionally below the knee on the left. On examination, Dr. Graybill noted limited range of motion in the left hip and a limp with walking. Dr. Graybill also reviewed x-ray findings of the left hip, which showed severe degenerative disease. He recommended a total left hip replacement.

On March 4, 2009, Dr. Graybill performed total left hip replacement surgery. On March 16, 2009, Clingerman was seen for follow-up after her hip surgery. She was ambulating with assistance from a walker. Three days later, Clingerman stated that she continued to have some hip pain that was worse at night.

On April 27, 2009, Clingerman saw Dr. Graybill for a "wound check." Dr. Graybill noted that she was using a cane only outside the house and that she could otherwise walk pain free without a cane.

On May 18, 2009, Clingerman stated that overall she was feeling well. She was observed to have a slightly Trendelenburg gait. X-rays showed relatively good healing of the hip surgery, but severe lumbar scoliosis and disc space collapse. Dr. Graybill discussed her leg length discrepancy and noted that her legs were now better balanced than they were before, but her back problems overrode this improvement. Dr. Graybill recommended home exercises. Dr. Graybill recommended a follow-up in four months with x-rays of the pelvis and left hip.

On September 21, 2009, Clingerman was seen again by Dr. Graybill for lower back pain, pain in the lower extremities, and increased pain with sitting. She also reported some numbness in the thigh. Dr. Graybill's examination revealed a mild Trendelenburg and antalgic gait, decreased sensation of the thigh on the left, trochanteric tenderness on the left, and significant scoliosis with tenderness in the spine. Dr. Graybill diagnosed stable hip replacement, trochanteric bursitis, low back pain, scoliosis, and radiculitis. The doctor opined that she could not stand or walk for any reasonable distance and required use of a cane for ambulation.

In a letter to Clingerman's counsel dated September 23, 2009, Dr. Graybill opined that Clingerman was disabled primarily as a result of her back problems. Her symptoms included low back pain, lateral hip pain, and pain radiating down the thigh. Dr. Graybill reported that Ms. Clingerman was unable to sit or stand for any significant length of time and required a cane for ambulation. Clinical findings included severely abnormal motion in her back, tenderness over the left greater trochanter, decreased sensation of the left thigh, and a mildly positive Trendelenburg on the left. Dr. Graybill stated that although she could perform light activities of daily living, Clingerman was unable to climb stairs without assistance or ambulate without a cane. Dr. Graybill opined that Clingerman was able to sit approximately one hour total and stand one hour total in an eight-hour workday. She also needed to get up and move around frequently, a couple times an hour, when sitting due to her back problems. In his letter, Dr. Graybill noted that he was a "total joint specialist" and was "not treating her back." He concluded his letter by stating that he did "not feel competent answering most of the rest of the questions" posed to him by counsel. He opined that "she probably needs a spinal evaluation to complete the rest of the portions on your disability questionnaire."

On March 22, 2010, Clingerman was seen by Dr. Graybill for follow-up. She complained of left lower back pain with pain radiating down the left leg. Dr. Graybill's examination revealed an antalgic gait on the left, diminished range of motion in the lumbar spine with severe pain, scoliosis, left low back pain tenderness radiating down through the gluteal area, decreased sensation of the thigh on the left, and trochanteric tenderness of the left greater than right hip. Dr. Graybill reviewed x-rays of Clingerman's hips and noted mild right hip arthritis. He recounted that previous x-rays had shown a severe amount of scoliosis with degenerative disc-space narrowing. He also explained that "[Clingerman] is in the process of trying to get Disability. I think that the reason for this is actually her back, not her hip. She has not had a back evaluation in some time, and I think that an expeditious back evaluation might be very helpful to her."

### C.  Dr. Francesca Tekula

Dr. Francesca Tekula evaluated Clingerman on April 16, 2010. Clingerman complained of intractable low back pain since 2007. She reported being unable to sit more than thirty minutes or stand more than fifteen minutes. Dr. Tekula observed that she walked with a cane and leaning forward. The doctor noted some tenderness along the left sacroiliac region and prominent curvature of the spine. Dr. Tekula diagnosed severe scoliosis, sacroiliac pain, and intractable back discomfort. The doctor opined that Clingerman had reached "maximal medical improvement" as there was "simply no surgery, therapy, or injection at this time that . . . would be helpful."

In a letter to Clingerman's counsel dated June 9, 2010, Dr. Tekula reiterated the findings from her evaluation in April 2010. She also noted that x-rays showed Clingerman had severe osteopenia with an extreme scoliotic curvature. It was noted that Plaintiff had failed to respond to several injections of her spine. Dr. Tekula opined that Clingerman would qualify for disability

6

and had reached maximum medical improvement and the only management tool for her back issues was medication.

### D. Chiropractor Robin Baker

Dr. Robin Baker completed a narrative report regarding Clingerman on August 5, 2009. Dr. Baker noted that Plaintiff had been a patient since May 2, 2006, when she presented with neck and hip pain. Dr. Baker diagnosed scoliosis, lumbar spondylosis, lumbar subluxation, low back pain, thoracic subluxation, thoracic osteoarthritis, cervical subluxation, and cervical disc degeneration. Treatment consisted of chiropractic adjustments and physiotherapy on an average of once a month, but sometimes as often as multiple times in a week. Dr. Baker stated that the treatment provided short term relief, but never complete relief. Dr. Baker opined that Clingerman was unable to stand or sit for a prolonged period of time. She could not lift more than ten to fifteen pounds regularly. In addition, she needed to refrain from climbing and stooping. Dr. Baker concluded that "[Clingerman's] condition is one that will not improve over time. In actuality her spine will most likely continue to degenerate, therefore the symptoms and pain associated with it can continue to get worse. It is my opinion that she is permanently disabled."

Dr. Baker also completed a Multiple Impairment Questionnaire dated October 20, 2009. Dr. Baker diagnosed severe degenerative disc and joint disease, scoliosis, and spondylosis. Clinical findings included decreased range of motion, guarded movements, tenderness to palpation, inflammations, and fixations. Dr. Baker also cited to x-ray findings supporting the diagnoses. Clingerman's primary symptoms were low back pain, hip and leg pain, neck pain, decreased sleep, and difficulties walking and standing. Her pain was rated as severe, 10 on a 10-point scale and fatigue as moderately severe, 8 on a 10-point scale. Dr. Baker reported that the symptoms and limitations identified in the questionnaire were present since June 2007. Dr. Baker

opined that Clingerman was able to sit for no more than one hour total and stand/walk no more than one hour total in an eight-hour workday. She needed to "frequently" get up and move around. Clingerman was also restricted to occasionally lift and carry up to five pounds, but never more. She had significant limitations performing repetitive reaching, handling, fingering, and lifting due to pain most of the time. Dr. Baker found that Clingerman was markedly limited (defined as essentially precluded) from using her upper extremities for grasping, turning, and twisting objects, and reaching, and moderately limited (defined as significantly limited) in using her hands for fine manipulations. The chiropractor noted that Clingerman required unscheduled breaks to rest approximately every hour during an eight-hour workday. She experienced bad days and "better days." Dr. Baker estimated that Clingerman would be absent from work, on the average, more than three times a month due to her impairment or treatment.

### E. Clingerman's Hearing Testimony

Clingerman testified that she stopped working because of pain in her back and left leg that prevented her from performing her job duties. She described burning pain in her back that radiates to her groin and down to her knee on a constant basis. She reported that her symptoms had worsened since she stopped working. Clingerman estimated that she can stand for fifteen minutes before she has to sit or lie down. She cannot walk even one block. She estimated that she can sit for thirty minutes before she has to stand up because of increased pain. Clingerman has to lie down two to three times a day.

On a typical day, Clingerman gets up and reads the paper. Then she moves around a little before she sits to have something to eat. After that, she lies down for a while. When she gets up, Clingerman does some bathing and puts laundry in the machine and sits down while the laundry is going. Her husband puts the clothes away and does the other household chores. Her husband

also does the grocery shopping. She sleeps approximately five hours a night, but is awake every two hours due to pain. As a result, Clingerman is often tired during the day.

She reported receiving injections in her spine that did not help at all. She also has trouble getting on and off the table at her chiropractor's office.

### III.     APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d) (1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R.

§ 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir.2008). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Id.*

### IV.   THE ALJ'S DECISION

The ALJ found at step one that Clingerman had not engaged in substantial gainful activity since the amended alleged onset date of June 18, 2007. At step two, the ALJ concluded that Clingerman had the following severe impairments: scoliosis of the lumbar spine; arthritis of the lumbar spine (spondylosis, stenosis); chronic obstructive pulmonary disease with bullos emphysema and ongoing nicotine dependence; psoriasis; right knee minimal chondrocalunosis; and osteoarthritis of left hip surgically corrected with total left hip replacement. At step three, the ALJ found that those impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Clingerman had the residual functional capacity ("RFC") to perform sedentary work with the following postural and environmental limitations:

> Specifically, the claimant has the functional capacity to occasionally lift and carry up to ten pounds and to frequently lift and carry light articles weighing less than ten pounds. The claimant has the capacity to stand and/or walk up to two hours in an eight-hour workday and has the capacity to sit up to six hours in an eight-hour workday. The claimant requires the ability change position while at work every 45-60 minutes, but does not require leaving the workstation. The claimant has the unlimited ability to push and pull up to the capacity for lifting and carrying. The claimant has the capacity to frequently balance and occasionally stoop, crouch, and climb stairs and ramps. The claimant has the capacity to kneel and crawl less than occasionally. The claimant has no limitations in the capacity to reach, handle, finger, or in the ability to feel. The claimant has the capacity for occasional exposure to dust, fumes, and other pulmonary irritants. Mentally the claimant has the capacity to understand, remember and carry out multiple-step, complex tasks. The claimant has the capacity to appropriately interact with supervisors, coworkers, and the general-public. The claimant has the capacity to identify and avoid normal place hazards and to adapt to routine changes in the work place.

Given this RFC, the ALJ concluded that Clingerman was unable to perform her past relevant work as a nurse coordinator and nurse. The ALJ then found that Clingerman had acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy, such as outpatient admitting clerk and hospital clerk. Therefore, the ALJ determined that Clingerman was not disabled as defined by the Act from June 18, 2007 through the date of her decision.

## V.     DISCUSSION

Clingerman advances several objections to the ALJ's decision; each is addressed below.

### A.     Weight Accorded Treating Physicians

Clingerman contends that the ALJ failed to apply the appropriate legal standard for weighing the opinions of treating physicians Drs. Purdy, Graybill, and Tekula, and chiropractor Baker.

> A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). An ALJ who rejects a treating physician's opinion must provide a sound explanation for the rejection. 20 C.F.R. §

11

>  404.1527(d)(2); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).

*Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). " 'If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

With regard to Dr. Graybill, the Court agrees with Clingerman. The ALJ gave Dr. Graybill's September 23, 2009, opinion regarding Clingerman's functional capabilities "limited weight" on the ground that "it is not entirely consistent with his clinical examinations and opines disability due to the claimant's back impairment, which he did not treat her for." However, the ALJ does not identify what parts of Dr. Graybill's clinical examinations are inconsistent with the doctor's opinion. The ALJ also fails to address any of the other required factors, except for Dr. Graybill's specialty and in regard to this factor, the ALJ's analysis is not sound. While it is true that Dr. Graybill did not treat Clingerman for back problems, the record indicates that Dr. Graybill's assessment of back problems are grounded in clinical evidence, not mere patient-report. Furthermore, there is no indication that Dr. Graybill, as a "total joint specialist," would be unable to assess Clingerman's abilities even though he was not actively treating her back problems. *Compare Elder v. Astrue*, 529 F.3d 408, 416(7th Cir. 2008) (holding that it was not error for the ALJ to reject a treating physician's opinion about fibromyalgia where the doctor was not a rheumatologist and doctor did not conduct a medical examinations or tests of the claimant). Finally, and perhaps most importantly, Dr. Graybill's report is inherently trustworthy, given that he explicitly limits his comments to areas that he feels himself competent to assess.

Insofar as the ALJ erred by not explaining her reasoning behind the weight she accorded Dr. Graybill's opinion, the Court is unable to assess whether Dr. Graybill's opinion was accorded the proper weight.

According to Clingerman, the ALJ also failed to properly evaluate Chiropractor Baker's opinion as to Clingerman's functional capabilities. Specifically, the ALJ gave Dr. Baker's August 5, 2009, functional assessment "limited weight" because "it opines on issues reserved to the Commission, the functional assessments suggested are consistent with the assessed residual functional capacity, and is not by an acceptable medical source." As an initial matter, the Court is at a complete loss to identify any consistencies between Dr. Baker's August 5, 2009, functional assessment and the ALJ's ultimate RFC.[1] Furthermore, it was error for the ALJ to disregard the entirety of Dr. Baker's report because she concludes with an opinion as to Clingerman's eligibility for disability status; the report otherwise includes detailed and non-conclusory information.

Clingerman admits that, as a chiropractor, Dr. Baker is not an "acceptable medical source," and therefore cannot establish the existence of a medically determinable impairment. SSR 06-03p. Nevertheless, evidence from "other sources" such as Dr. Baker are "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." *Id.* There is no indication that the ALJ considered Dr. Baker's opinion as to Clingerman's limitations on the key issues of her limitations. Finally, the Court notes that there is no mention of Dr. Baker's even-more-detailed October 20, 2009,

---

[1] The inconsistencies run both ways. While Dr. Baker opined that Clingerman must avoid "prolonged sitting," the ALJ found that Clingerman could sit for up to six hours in an eight-hour work day, with merely the ability to "change position" every 45-60 minutes. Conversely, while the ALJ found that Clingerman could occasionally lift and carry up to ten pounds and frequently lift and carry light articles weighing less than ten pounds, Dr. Baker opined that Clinger could not lift more than ten to fifteen pounds regularly.

impairment questionnaire in the ALJ's decision. As a result, the Court finds that the ALJ's assessment of Dr. Baker's opinions was insufficient and must be reversed.

Clingerman also argues that the ALJ erred when she rejected Dr. Purdy's and Dr. Tekula's opinions on the ground that their opinions "opine[] on an issue reserved to the Commissioner." The Court finds no error here. The records the ALJ cited and then rejected provide no insight into Clingerman's capabilities; rather, each record states merely that Clingerman is disabled. Insofar as these records indicate clinical findings, the ALJ considered them in her opinion; there was no opinion evidence in these records for the ALJ to consider other than the doctors' conclusory statements as to disability.

Finally, Clingerman points out that the ALJ's residual functional capacity as a whole is not supported by medical evidence in the record. The Court agrees that the ALJ's RFC seems to have little, if any, support in the record. The ALJ's assessment that Clingerman can sit for six hours in an eight-hour work day is especially suspect in the face of the repeated opinions of various treating physicians that she cannot sit for more than an hour. In sum, the ALJ's assessment of the opinion evidence of Clingerman's treating physicians, as well as her resulting RFC taken as a whole, is in error and must be reversed.

### B.     Credibility Determination

Clingerman contends that the ALJ erred when she dismissed the reported severity of Clingerman's symptoms. In determining credibility, an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, and justify the finding with specific reasons. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). "Furthermore,

the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Id.* (citations omitted).

Clingerman faults the ALJ for using impermissible, nonsensical boilerplate to explain her rejection of Clingerman's reported symptoms. The Court shares in the sentiments expressed in recent Seventh Circuit opinions regarding the meaninglessness of certain Social Security "templates," such as the one used here. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012). However, in this case the problem is even more fundamental: there is no indication in the ALJ's decision that she even considered Clingerman's testimony, much less that she considered it, rejected it, and supported her rejection with specific reasons. On remand, the ALJ should consider Clingerman's testimony in determining the intensity, persistence, and limiting effects of her symptoms and if the ALJ discredits these statements, she should specifically explain her reasons for doing so.

### C.     RFC and Vocational Assessment

Finally, Clingerman argues that the ALJ erred when she determined that Clingerman was not disabled because she could perform some sedentary jobs. According to Clingerman, the source of this error is assigning an RFC that is not supported by substantial evidence. As a result, Clingerman argues, the Vocational Expert's testimony was not based on Clingerman's limitations and does not accurately reflect the jobs Clingerman could do.

In evaluating a claim, the ALJ must give full consideration to all of a claimant's documented impairments. *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). The Court has already found that the ALJ erred in her assessment of the weight she accorded Clingerman's treating physicians. As a result, a dark shadow is cast over the accuracy of ALJ's RFC and the vocational expert's testimony. On remand, the ALJ should assess the treating physicians'

opinions consistent with the analysis above and thereafter adjust Clingerman's RFC accordingly. Only then will the vocational expert's testimony be an accurate reflection of Clingerman's ability to work.

## VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED: 12/13/2012

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.